RODMAN v. ROBINSON.

(Filed March 29, 1904).

1. SPECIFIC PERFORMANCE — *Husband and Wife — Contracts — Dower.*

Where a wife is not a party to an action for specific performance of a contract to convey land executed by the husband, he cannot avoid a decree for the conveyance by asserting that his wife was entitled to dower in the land.

2. SUNDAY—*Contracts—Specific Performance—The Code, sec. 3782— Const. U. S., First Amendment—Const. N. C., Art. I, sec. 26— The Code, secs. 2103, 2106.*

A contract for the conveyance of land entered into on sunday is not invalid as against public policy.

3. SPECIFIC PERFORMANCE—*Election of Remedies.*

A purchaser of land, on breach of the contract of sale, may sue for specific performance and is not bound to bring an action at law for damages.

4. VENDOR AND PURCHASER—*Consideration—Contracts.*

A promise to pay a certain sum as purchase-money is a sufficient consideration for a contract to convey land.

5. SPECIFIC PERFORMANCE—*Contracts—Fraud.*

Where no fraud or mistake is averred, an allegation that the vendor made a bad trade does not exempt him from specific performance of a contract to convey land.

6. SPECIFIC PERFORMANCE—*Boundaries—Contracts.*

In a suit for specific performance of a contract to convey land, describing the land by metes and bounds is sufficient.

7. VENDOR AND PURCHASER—*Specific Performance.*

A promise to pay a certain sum as purchase-money is a sufficient consideration for a contract to convey land.

ACTION by J. F. Rodman and others against J. W. S. Robinson, heard by *Judge W. R. Allen,* at September Term, 1903, of the Superior Court of PENDER County. From a judgment for the plaintiffs the defendant appealed.

*Connor & Connor* and *E. K. Bryan,* for the plaintiffs.

*J. D. Kerr, F. R. Cooper* and *Shepherd & Shepherd,* for the defendant.

CLARK, C. J. On Sunday, September 14, 1902, the defendant, who then was and still is the owner in fee and in possession of the land described in the complaint, contracted in writing, dated September 13, 1902, with plaintiff Rodman to sell him said land, possession to be given the first of January, 1903, and deed to be delivered the first of April, 1903, at which time the purchase-money was to be paid. In December, 1902, defendant informed Rodman that he would not deliver possession nor accept the purchase-money and repudiated the contract, nevertheless Rodman did tender the $4,200, the agreed price, in money on first of April, 1903, or as soon thereafter as defendant could be found, and demanded the deed, but defendant refused to accept the money or deliver the deed. The contract is admitted in the answer, and judgment for specific performance was rendered upon the pleadings and defendant appealed.

The first assignment of error is "because it appears from the answer that defendant was at the time of signing said alleged contract to convey a married man, and his wife is still living and entitled to dower and homestead right in said land, and the judgment does not sufficiently guard and protect such right." The wife has an inchoate right of dower, but she has no present right to the property nor to its possession, nor any dominion over it, she has only a right therein

contingent upon surviving her husband, which may not happen. *Gatewood v. Tomlinson,* 113 N. C., 312. The Code, section 2103, expressly provides that *upon the death of the husband* the widow shall be entitled to dower. Besides, this is an objection which the plaintiff alone could make. The wife is not a party to this action and the decree in no wise affects her contingent interest. Having taken the contract without the wife's signature, the plaintiff could not obtain a decree compelling her to join in the deed. *Farthing v. Rochelle,* 131 N. C., 563; *Fortune v. Watkins,* 94 N. C., 304. The Code, section 2106, recognizes the right of the husband to alien without the joinder of the wife, the conveyance having no effect upon the wife's contingent right of dower. *Fleming v. Graham,* 110 N. C., 374; *Scott v. Lane,* 109 N. C., 154; *Hughes v. Hodges,* 102 N. C., 236; *Mayho v. Cotten,* 69 N. C., 289. As to the homestead right, it was not necessary for the wife to join in the contract, because the answer admits that no homestead had been allotted in this land. *Mayho v. Cotten, supra,* approved, *Joyner v. Sugg,* 132 N. C., at page 589. Besides, the answer further admits the solvency of the defendant, that there is no judgment docketed against him, and that he owns other lands more than sufficient in value for the allotment of the homestead. *Hughes v. Hodges, supra.* The conveyance or contract is valid, subject to the contingent right of dower. *Gatewood v. Tomlinson* and *Scott v. Lane, supra.* The wife is not a party to this action and not estopped by the judgment if the above admissions should prove untrue. The wife not being a party, the exception that her "rights are not protected by the decree" has no place here.

The second assignment of error is "because the contract to convey was entered into and signed upon Sunday, and no consideration being passed, and the defendant having

repudiated the contract the week following, said contract is not enforcible and the judgment should have declared said contract to be void." The promise to pay $4,200 purchase-money was a sufficient consideration. *Puffer v. Lucas,* 101 N. C., at page 284; *Worthy v. Brady,* 91 N. C., 265, S. C., 108 N. C., 440; Clark on Contracts, pp. 149, 169; 9 Cyc., 323. The contract having been accepted by plaintiff the attempted repudiation thereof by the defendant without the consent of the plaintiff has no effect. *Paddock v. Davenport,* 107 N. C., 710; *Ryan v. U. S.,* 136 U. S., 68. So this exception hinges upon the question whether the contract is invalid because entered into and signed on Sunday.

This point has been settled in this State by repeated decisions. A contract entered into on Sunday is not invalid at common law. Clark on Cont., p. 393; *Drury v. De Fontaine,* 1 Taunton, 131 (in which it was held that a vendor could recover the price of a horse sold on Sunday); Benjamin on Sales, section 552. Our statute, The Code, section 3782, is copied almost verbatim from the first part of the statute, 29 Car. II., chapter 17. (1678). The other part forbidding service of process on Sunday is omitted from our statute, which merely provides that "on the Lord's Day, commonly called Sunday, no tradesman, artificer, planter, laborer or other person shall  *   *   *   do or exercise any labor, business or work of his ordinary calling,  *   *   *   upon pain that every person so offending  *   *   * shall forfeit and pay one dollar." This part was construed by *Lord Mansfield in Drury v. DeFontaine, supra,* not to invalidate a sale of a horse on Sunday when the sale was not a part of the vendor's ordinary calling. This statute is the foundation of nearly all the Sunday legislation in this country.

It is not alleged in the answer that this contract was made and entered into by either the plaintiff Rodman or the de-

RODMAN *v.* ROBINSON.

fendant Robinson in pursuance by either of his ordinary calling.

In *Melvin v. Easley,* 52 N. C., 356, the Court said: "The statute in its operation is confined to manual, visible or noisy labor, such as is calculated to disturb other people, for example, keeping open shop or working at a blacksmith's anvil. The Legislature has power to prohibit labor of this kind on Sunday on the ground of public decency. * * * But when it goes further and * * * prohibits labor which is done in private the power is exceeded and the statute is void." In that case it was held that selling a horse on Sunday was not forbidden by the statute, as dealing in horses was not Melvin's "ordinary calling." Again, it is said in *State v. Ricketts,* 74 N. C., 192: "In this State every act may lawfully be done on Sunday which may lawfully be done on any other day, unless there is some statute forbidding it to be done on that day." This has been cited and approved, *White v. Morris,* 107 N. C., at p. 99 (in which *Davis, J.,* calls attention to the fact that prior to The Code civil process could not legally be served on Sunday, but now the restriction applies only to forbid arrests in civil actions on that day), approved also in *State v. Penley,* 107 N. C., 808; *Ashe, J.,* in *State v. McGimsey,* 80 N. C., 377, 30 Am. Rep., 90; and *State v. Howard,* 82 N. C., at p. 626; *Merrimon, C. J.,* in *State v. Moore,* 104 N. C., 749; *Taylor v. Ervin,* 119 N. C., 276, all these last holding that it was not illegal to hold Court on Sunday if the Judge deemed it necessary, though out of considerations of propriety it ought not to be done unless necessary.

In *State v. Brooksbanks,* 28 N. C., 73, *Ruffin, C. J.,* held that it was not indictable to sell goods in open shop on Sunday, and in *State v. Williams,* 26 N. C., 400, the Court through the same Judge held it not indictable to work on Sunday, it not being indictable either at common law (citing

*Rex v. Brotherton,* 1 Str., 702; *Rex v. Cox,* Bur., 785),
or by our statute, adding (p. 400): "It is clear that the
making of bargains on Sunday was not a crime against the
State, for contracts made on that day are binding. It has
often been so ruled in this State, and after elaborate argu-
ment and time to advise." *Covington v. Threadgill,* 88 N.
C., 189, is *obiter* merely, and *Waters v. Railroad,* 108 N.
C., 349, is a construction of section 1632, General Statutes
South Carolina, which is a part of the statute 29 Car. II.,
which has been omitted in our statute.

Counsel for defendant contend that Christianity is a part
of the law of the land, and hence, independent of any statute,
the contract is invalid. If the observance of Sunday were
commanded by statute as an act of religion or worship, such
statute would be absolutely forbidden. The founder of the
Christian religion said that his "Kingdom was not of this
world," and under our Constitutions, both State and Federal,
no act can be required or forbidden by statute because such
act may be in accordance with or against the religious views
of any one. The first amendment to the Federal Constitu-
tion' provides: "Congress shall make no law respecting an
establishment of religion or prohibiting the free exercise
thereof," and the Constitution of this State, Article I, section
26, reads: "All men have a natural and unalienable right
to worship Almighty God according to the dictates of their
own consciences, and no human authority should *in any case
whatever* control or interfere with the right of conscience."
If therefore the cessation of labor or the prohibition or per-
formance of any act were provided by statute for religious
reasons the statute could not be maintained. The Seventh
Day Baptists and some others, as well as the Hebrews, keep
Saturday, and the Mahommedans observe Friday. To com-
pel them or any one else to observe Sunday for religious
reasons would be contrary to our fundamental law. The

RODMAN *v.* ROBINSON.

only ground upon which "Sunday laws" can be sustained is that in pursuance of the police power the State can and ought to require a cessation of labor upon specified days to protect the masses from being worn-out by incessant and unremitting toil. If such days happen to be those upon which the larger part of the people observe a cessation of toil for religious reasons, it is not an objection but a convenience. Yet such statute can not be construed beyond its terms so as to make the signing of a contract on Sunday invalid when the words prohibit only "labor, business or work of one's ordinary calling."

It is incorrect to say that Christianity is a part of the common law of the land, however it may be in England where there is union of church and state, which is forbidden here. The beautiful and divine precepts of the Nazarene do influence the conduct of our people and individuals, and are felt in legislation and in every department of activity. They profoundly impress and shape our civilization. But it is by this influence that it acts, and not because it is a part of the organic law which expressly denies religion any place in the supervision or control of secular affairs. As a cotemporary construction of the Federal Constitution, it may be well to recall that one of the first treaties of peace made by the United States—that with Tripoli—which was sent to the Senate with the signature of George Washington, who had been president of the convention which adopted the United States Constitution, began with these words: "As the government of the United States is not in any sense founded on the Christian religion." This treaty was ratified. by the Senate. If it was presumption in Uzza to put forth his hand to stay the tottering Ark of God at the threshing floor of Chidon, it is equally forbidden under our severance of church and state for the civil power to enforce cessation of work upon the Lord's Day in maintenance of

any religious views in regard to its proper observance. That must be left to the consciences of men, as they are severally influenced by their religious instruction. Churches differ widely, as is well known, on this subject, the views of Roman Catholics and Presbyterians, for instance, being divergent, and the views of other churches differing from both.

Even if Christianity could be deemed the basis of our government, its own organic law must be found in the New Testament, and there we shall look in vain for any requirement to observe Sunday, or indeed any day. The Master's references to the Sabbath were not in support but in derogation of the extreme observance of the Mosaic day of rest indulged in by the Pharisees. The Old Testament commanded the observance of the Sabbath, but that was an injunction laid upon the Hebrews, and it designated Saturday, not Sunday, as the day of rest, prescribing a thoroughness of abstention from labor which few observe, even of the people to whom the command was given.

Sunday was first adopted by Christians in lieu of Saturday long years after Christ, in commemoration of the Resurrection. The first "Sunday law" was enacted in the year 321 after Christ, soon after the Emperor Constantine had abjured paganism, and apparently for a different reason than the Christian observance of the day. It is as follows: "Let all judges and city people and all tradesmen rest upon the *venerable day of the Sun*. But let those dwelling in the country freely and with full liberty attend to the culture of their fields, since it frequently happens that no other day is so fit for the sowing of grain or the planting of vines; hence the favorable time should not be allowed to pass lest the provisions of heaven be lost." Codex, Justin, lib. III, tit. XII, 1, 3. Evidently Constantine was still something of a heathen. As late as the year 409 two rescripts of the Emperors Honorius and Theodosius indicate that Christians

then still generally observed the Sabbath (Saturday *not* Sunday). The curious may find these set out in full, Codex Just., lib. I, tit. IX, Cx. 13. Not till near the end of the ninth century was Sunday substituted by law for Saturday as the day of rest by a decree of the Emperor Leo (Leo Cons., 54). The subsequent development of Sunday laws will be found in Lewis' "Sunday Legislation." This legislation has differed in different Christian countries and still differs, and the divergence is very great even in the legislation of the States of this Union.

The Saxon laws under Ine (about A. D. 700) forbade working on Sunday, but under Alfred (A. D. 900) and Athelstane (A. D. 924) the prohibition was merely against marketing on Sunday, and there seems to have been no statute against working on Sunday (whatever the church may have enjoined) until the above-cited statute, 29 Car. II., ch. 7 (1678), the first part of which is almost verbatim our statute, Code, section 3782. See 4 Blk. Com., 63. Indeed, it appears from the records of Merton College, Oxford, that at its manor of Ibstone, in the latter part of the thirteenth century, contracts with laborers provided for cessation from work on Saturdays and holidays, but it was stipulated that work should be done in regular course on Sunday. Thorold Rogers' "Work and Wages," chapter 1. Indeed, it seems that this was usual in England till the time of the Commonwealth and the rise of the Puritans to power, but the change was not enacted into law till the above-cited statute of Charles II. in 1678.

The first Sunday law in this country was enacted in Virginia in 1617 (three years before the landing at Plymouth), and punished a failure to attend church on Sunday with a fine payable in tobacco. This was re-enacted in 1623. Henning's Statutes at Large, Va., 1619-1660, Vol. I, p. 123. Plymouth Colony (Records, Vol. XI, p. 214) made it pun-

ishable by imprisonment in the stocks to go to sleep in church, and on June 10, 1650, the same colony made it punishable by whipping to do "any servile work or any such like abuse" on the Lord's Day. "So any sin committed with an high hand, as the gathering of sticks on the Sabbath day, may be punished with death, when a lesser punishment might serve for gathering sticks privily and in need." Records of Massachusetts Bay, Vol. II, p. 93. Publicity did not then have the virtue attributed to it as now, but the reverse. Hutchinson's History of Massachusetts, Vol. I, p. 390, says: "Divers other offenses were made capital, viz., profaning the Lord's Day in a careless or scornful neglect or contempt thereof (Numbers 15: 30-36)." The New Haven Colony Records, 1653-1655, p. 605, contain a similar provision that profaning the Lord's Day by "sinful servile work or unlawful sport, recreation or otherwise, whether wilfully or in a careless neglect, shall be duly punished by fine, imprisonment, or corporally, according to the nature and measure of such sin and offense"; providing further that if "the sin was proudly, presumptuously and with a high hand committed" such person "shall be put to death." On May 19, 1668, after the union of New Haven and Connecticut in one colony, unnecessary travel or playing on Sunday, or keeping out of the meeting-house, was made punishable by imprisonment in the stocks, adding "and the constables in the several plantations are hereby required to make search for all offenders against this law and make return thereof." Colonial Records of Connecticut, 1665-1667, p. 88. Similar laws, but of less severity, were enacted in some other provinces. While the statutes of the several States still differ on the subject of Sunday legislation, all of these enactments are now based upon the police power, that some rest may be guaranteed to the workers and to avoid offense by the noise and tumult of traffic and labor to

the great majority who desire a day of quiet and peace for their devotional services. Bishop on Contracts, section 536, says: "It is abundantly settled that a Sunday contract is good when it does not come in conflict with any statute." We do not deny the constitutionality of a Sunday law based on the police power, which is well settled. *Judefine v. State,* 22 L. R. A., 721, and notes. We hold that our statute does not make void the contract here sued on. In the language of *Caldwell, J.,* in *Swan v. Swan,* 21 Fed. Rep., at p. 305: "It would be downright hypocrisy for a court to affect to believe that the moral sense of the community would be shocked by compelling a man to pay a note given for an honest debt because it was executed on the Lord's Day." And the same is true of the enforcement of any contract which is not forbidden by statute to be made on Sunday.

Among the authorities elsewhere which hold in accordance with our decisions that a note or contract made on Sunday is valid, are *Barrett v. Aplington,* Fed. Cases, No. 1045; *More v. Clymer,* 12 Mo. App., 11; *Glover v. Cheatham,* 19 Mo. App., 656; *Sanders v. Johnson,* 29 Ga., 526; *Dorough v. Mort Co.* (Ga.), 45 S. E. Rep., 22 (1903); *Ray v. Cattel,* 51 Ky., 532; *Hazzard v. Day,* 14 Allen (Mass.), 487, 92 Am. Dec., 790; *Geer v. Putnam,* 10 Mass., 312; *Kaufmann v. Hamm,* 30 Mo., 388 (which held valid a promissory note made on Sunday; *Foster v. Wooten,* 67 Miss., 540; *Horacek v. Keebler,* 5 Neb., 355; *Fitzgerald v. Andrews,* 15 Neb., 52; *Switcher v. Williams,* Wright (Ohio), 754; *Bloom v. Richards,* 2 Ohio St., 387; *Hellams v. Abercrombie,* 15 S. C., 110, 40 Am. Rep., 684 (which holds a mortgage executed on Sunday to be valid); *Mills v. Williams,* 16 S. C., 593, 40 Am. Rep., 684; *Lucas v. Larkins,* 85 Tenn., 355 (privy examination on Sunday valid); *Gibbs v. Brucker,* 111 U. S., 597; *Allen v. Gardner,* 7 R. I., 22; *Moore v. Murdock,* 26 Cal., 514; *Johnson v. Brown,*

13 Kan., 529; *Birks v. French,* 21 Kan., 238; *Boynton v. Page,* 13 Wend., 425; *Miller v. Roessler,* 4 E. D. Smith, 234; *Balsord v. Every,* 44 Barb., 618; *Merritt v. Earle,* 29 N. Y., 515, 86 Am. Dec., 292; *Eberle v. Mehebach,* 55 N. Y., 682; *Amis v. Kyle,* 2 Yerg. (Tenn.), 31, 24 Am. Dec., 463; *Behan v. Ghio,* 75 Tex., 87; *Schneider v. Sanson,* 62 Tex., 201, 50 Am. Rep., 521; *Richmond v. Moore,* 107 Ill., 429, 47 Am. Rep., 445; *Main v. Johnson,* 7 Wash., 321; *Raines v. Watson,* 2 West Va., 371; Clark Contracts, 395, and there are others to same purport. There are decisions to the contrary, but they will be found almost entirely in States where the statute, unlike ours, is not restricted to "labor, business or work done in one's ordinary calling," but is extended in its terms so as to embrace the prohibition of contracts of all kinds on Sunday. In such cases, as is said in *Swan v. Swan* (U. S. C. C.), 21 Fed., 299, "Contracts made on the Lord's Day are not void on religious or moral grounds, but upon the familiar and established doctrine that when a statute inflicts a penalty for doing an act—no matter what that act may be—a court of justice will not enforce a contract made in violation of such statute." The execution of a will on Sunday seems to be held valid everywhere. The Pennsylvania Court in 1850 was evenly divided on the question whether "a marriage contract executed on Sunday was such worldly employment or business as was forbidden on that day." *In re Gongwere's Estate,* 14 Pa., 417, 53 Am. Dec., 554, but better advised later, in 1882 they held that a contract of marriage entered into on Sunday was valid. *Markley v. Kessering,* 2 Penny, 187.

To sum up the whole matter, the validity, in the courts, of any act done on Sunday depends not upon religious views but upon the statute of each particular State, and our statute only forbidding "labor, work or business of one's ordinary calling" does not invalidate a contract, as here, which was

not an act done as a part of the plaintiff's usual business or calling. Bishop Contracts, section 538, and cases cited. As was said in *State v. Ricketts, supra,* "What religion and morality permit or forbid to be done on Sunday is not within our province to decide."

The third exception is that the agreement to convey was void because without consideration and against public policy. Both these points have been disposed of. See also, *Dowdy v. White,* 128 N. C., 17, as to mutual promises being sufficient consideration, and on public policy, see note at end of opinion in *Swan v. Swan,* 21 Fed. Rep., p. 308.

The fourth and last exception is that the decree is "for specific performance, while the plaintiff at most is entitled only to damages for breach of contract." In *Bryson v. Teak,* 43 N. C., 310, it is held: "In case of breach of contract of sale, the injured party is entitled at his election to a bill for specific performance, and is not bound to bring an action at law for damages." To same purport, *Springs v. Sanders,* 62 N. C., 67; *Young v. Griffith,* 84 N. C., 715; *Hargrove v. Adcock,* 111 N. C., 166; *Stamper v. Stamper,* 121 N. C., 251; *Whitted v. Fuquay,* 127 N. C., 68; *Hennessy v. Wolworth,* 128 U. S., 138.

The allegation that the defendant made a bad trade, there being no fraud or mistake alleged, does not exempt him from specific performance. *Stamper v. Stamper,* and *Whitted v. Fuquay, supra; Moore v. Reed,* 37 N. C., 580. If, as the defendant admits, he is liable to damages for the difference between the contract price and the value of the land, then he is not hurt because he would have to pay the difference, and there would be no reason for a refusal to decree specific performance.

There is no fraud or mistake as alleged. The land is described by metes and bounds, and that is sufficient. Laws 1891, chapter 465; *Carson v. Ray,* 52 N. C., 609, 78 Am.

Dec., 267; *Fortescue v. Crawford,* 105 N. C., 29; *Farthing v. Rochelle,* 131 N. C., 563.

The decree should have directed the defendant to make reasonable effort to get his wife. to sign the deed. *Swepson v. Johnston,* 84 N. C., 449; *Welborn v. Sechrist,* 88 N. C., at p. 292; but that was error against the plaintiffs, who are not appealing.

No Error.

WALKER, J., concurs in result.

CONNOR, J., having been of counsel did not sit on the hearing of this case.